UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMON OTETIANI EL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 17 C 890 |
| ) | |
| ADVOCATE HEALTH AND HOSPITAL ) | Judge Rebecca R. Pallmeyer |
| CORP., d/b/a ADVOCATE MEDICAL ) | |
| GROUP, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jamon Otetiani El, who identifies as Native American, alleges that his former employer, Defendant Advocate Health and Hospital Group, violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by discharging him on the basis of race. Defendant has moved for summary judgment [28], contending that Otetiani El was discharged because of his unsatisfactory job performance, not because of his race. (Memo. of Law in Supp. of Def.'s Mot. for Summ. J. [29] ("Def.'s Opening Br."), 1.) For the reasons explained here, the court concludes there are no disputes of material fact on this issue and that Advocate is entitled to judgment as a matter of law.

## FACTUAL BACKGROUND

### I. Requirements of LR 56.1

The requirements established by this court's Local Rule 56.1 are familiar: a party moving for summary judgment must submit a statement of material facts consisting of short numbered paragraphs, each one supported by specific references to the record and other supporting materials. N.D. Ill. L.R. 56.1(a)(3). The Rule requires, further, that a party opposing summary judgment respond to the moving party's numbered paragraph and include, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting

materials relied upon . . . ." N.D. Ill. L.R. 56.1 (b)(3). To ensure that a *pro se* litigant understands these requirements, our Local Rule 56.2 directs that the moving party provide such a litigant with notice of the requirements for responding properly and the consequences for failing to do so. Defendant Advocate has served the appropriate notice in this case [31]. Because Plaintiff's response to the motion nevertheless does not comply with Local Rule 56.1, Advocate argues that it must be disregarded. *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005) (district court may discount or disregard a *pro se* litigant's statement of facts that does not comply with Local Rule 56.1).

In his Rule 56.1 response [34], Plaintiff has not responded to the numbered paragraphs in Defendant's Rule 56.1 statement and failed to support his assertions with citations to specific page numbers or paragraph numbers in the record. The court nevertheless has reviewed his response liberally, adopting those factual allegations that Defendant has admitted or are adequately supported by evidence in the record.

**II.     Background**

Defendant Advocate, the largest healthcare system in Illinois, is a not-for-profit organization that operates hospitals, outpatient centers, immediate care clinics, surgical centers, laboratories, imaging centers, and physical therapy locations. (Gustafson Decl. ¶ 4, Ex. C to Def.'s Statement of Material Facts [30] ("DSOF").) In 1994, Advocate hired Plaintiff to work as a Radiologic Technologist at an Advocate facility that provides x-ray examinations and other services in South Holland, Illinois. (*Id.* at ¶ 5; Otetiani El Dep. 33:6–9, 78:3–4, Ex. B to DSOF.) For the first 16 years of his employment, Plaintiff identified as African American and was known by the name James Kane. (Otetiani El Dep. 5:12-13, 19:7-13, 21:9-17.) Around 2009, through his own independent research, Plaintiff discovered that he is in fact Native American. (*Id.* at 19:19–24, 20:1–6.) In August 2010, Plaintiff legally changed his name to Jamon Otetiani El. (*Id.* at 18:15–16, 19:7–13.) Later that year, Plaintiff notified Advocate's HR department of his name

change and changed his race-identification in Advocate's records to Native American. (*Id.* at 18:15–22, 19:8–13.)

Defendant maintains an Equal Employment Opportunity Policy under which all Advocate employees are expected to "act fairly [and] without regard to [employees'] race, color, creed, national origin, ethnicity, gender, age, sexual orientation, or disabilities." (Advocate Equal Employment Opportunity Policy ("EEO Policy"), Ex. D to DSOF.) Advocate has also adopted a Corrective Action Policy that seeks to ensure discipline is administered fairly and consistently to all employees. (Gustafson Decl. ¶ 6.) The Corrective Action Policy identifies the following as rule violations: "negligence, abuse or inattention to patient care," "failure or refusal to perform assigned duties or carry out instructions, or engaging in any other insubordinate behavior," "failure to adhere to departmental, facility, or System standards of quality," and "willful or careless disregard of safety rules." (Corrective Action Policy 2–3, Ex. E to DSOF.) The policy also outlines three types of disciplinary measures which Defendant may take against an employee prior to termination: Level 1 Warning, Level 2 Warning, or Level 3 Warning. (*Id.* at 3.) Advocate's Policy also identifies certain rules, those critical to patient safety, as "Red Rules." (*Id.* at 2.) Defendant has the discretion to skip a warning level when an employee is guilty of a serious violation such as a Red Rule violation. (*Id.* at 3.)

Radiology Supervisor Ruby Johnson, an African American, was Plaintiff's direct supervisor from 2013 through the time of his discharge. (Johnson Decl. ¶¶ 1, 4, Ex. F to DSOF.) Johnson reported to the Imaging Services Manager, Camilla Nix, Caucasian, who reported to the Director of Radiology, Karen Tyrell Isaacs, also Caucasian. (*Id.* at ¶ 5; Gustafson Decl. ¶ 7.) Plaintiff asserts, without citing any supporting evidence, that Nix was his direct supervisor, but Johnson has attested that she herself, together with Nix and Isaacs, administered the Corrective Action Policy in disciplining Plaintiff. (Johnson Decl. ¶ 6.)

3

### III.     Plaintiff's Disciplinary History

On May 13, 2013, Plaintiff entered the waiting room and called out the name of a patient scheduled for an x-ray procedure. An Hispanic woman who did not speak English responded. (Otetiani El Dep. 82:4–13.) Plaintiff asked the woman to confirm that was her name, and she did; after the x-ray was performed, however, someone determined that the woman x-rayed was the wrong patient. (*Id.*; Johnson Decl. ¶ 7.) The record does not specify who made this determination, or how, but Plaintiff admits that he identified the wrong patient. (Pl.'s Compl. [7], 4.) He admits, further, that the correct procedure is to ask for the patient's name as well as his or her birth date, and that he failed to ask this patient for her birth date. (Otetiani El Dep. 82:2–24.) After this incident, Johnson, Nix, and Isaacs discussed it and agreed that performing an x-ray on an incorrect patient jeopardizes patient safety and that Plaintiff's failure to properly identify the patient constituted a Red Rule violation. (Johnson Decl. ¶ 8.) Further, because of the seriousness of the violation, Johnson, Nix, and Isaacs bypassed the step of issuing a Level 1 Warning to Plaintiff and instead proceeded directly to a Level 2 Warning. (*Id.*; May 22, 2013 Corrective Action, Ex. G to DSOF.) Plaintiff did not challenge the disciplinary action; he admittedly "felt bad about making such a mistake." (Pl.'s Compl. 4.)

On June 12, 2013, Plaintiff received an order from a doctor for two sets of x-rays, one of a patient's hand and another of the patient's wrist. (Otetiani El Dep. 46:8–23.) Plaintiff personally believed that both of the necessary views could be captured in one x-ray and therefore decided on his own to combine the two x-rays. (*Id.* at 89:3–7, 20–24, 90:1–9; Johnson Decl. ¶ 9.) Plaintiff did not consult with the ordering doctor nor his supervisor about this decision, even though he knew that Advocate policy requires Radiology Technologists to perform x-rays as requested by the ordering doctor. (Otetiani El Dep. 90:10–24, 91:3–24; Advocate X-Ray Procedures, Ex. H to DSOF.) In his Statement of Facts, Plaintiff asserts that he chose to combine the x-ray orders because the patient was a child and he wanted to save the child from unnecessary radiation. (Pl.'s Statement of Facts [34] ("PSOF"), 3.) Notably, the x-ray record itself identifies the patient's

4

age as 82; though Plaintiff disputes this, he offers nothing to rebut the hospital record beyond his own suspicion that Advocate falsified records of the patient's age. (Johnson Decl. ¶ 10; June 12, 2013, X-Ray Order, Ex. I to DSOF.) There is no evidence of such falsification, but the court notes that it makes no difference, as Advocate policy requires compliance with a doctor's x-ray orders, regardless of the patient's age. (Johnson Decl. ¶ 10; Advocate X-Ray Procedures.) Plaintiff also suggests that the doctor did not complain about his decision to take just one x-ray. (PSOF 3.) Again, the court presumes that discipline for a rules violation is appropriate regardless of whether a doctor has complained. In any event, Plaintiff cites nothing in support of this suggestion, either, and Defendant has submitted a sworn statement from Nix that the doctor did indeed complain about Plaintiff's failure to follow the x-ray orders. (Nix Reply Decl. ¶ 4, Ex. A to Def.'s Resp. to PSOF [39].)

On June 27, 2013, Johnson issued a Level 3 Final Warning to Plaintiff for his failure to follow the doctor's x-ray orders on June 12. (June 27, 2013 Corrective Action, Ex. J to DSOF; Otetiani El Dep. 45:19–24.) Plaintiff knew that this level of warning meant that any further disciplinary action taken against him within 12 months could result in his termination. (Otetiani El Dep. 92:10–15.) Plaintiff contends that a similarly-situated employee, who is not Native American, engaged in the same type of violation and was not disciplined (*id.* at 93:9–24), but he again fails to cite to any evidence to support this allegation. For its part, Defendant has presented evidence that the other employee to whom Plaintiff refers, who incorrectly performed an abdominal x-ray, was indeed disciplined—he received a Level 1 Warning for this error. (Walter Johnson Corrective Action Notice, Ex. M to DSOF.)

Pursuant to Advocate Policy, Plaintiff appealed his Level 3 Warning. When a disciplinary measure is appealed, Advocate convenes an arbitration panel to conduct an impartial review of a disciplinary decision. The panel consists of three members: a Facilitator from the Human Resources department, a Management Panel member, and an Associate Panel member who

may be chosen by the employee at issue. (Favaro Decl. ¶¶ 4–5, Ex. B to Def.'s Resp. to PSOF.) A majority vote of the panel makes the decision binding and final. (*Id.* at ¶ 5.)

The arbitration panel formed to review Plaintiff's Level 3 Warning consisted of John Favaro as the Facilitator from HR, Antwinette Wimbish as the Management Panel member, and Samuella McKnight as the Associate Panel member. (*Id.* at ¶¶ 3–5; Wimbish Decl. ¶¶ 3–5, Ex. C to Def.'s Resp. to PSOF.) The arbitration took place on September 20, 2013, and resulted in upholding the disciplinary action. (*Id.*; Otetiani El Dep. 122:5–10.) Plaintiff alleges that the arbitration process in his case was unfair and that the vote cast by Samuella McKnight (the arbitrator he had selected) "wasn't considered." (PSOF 7–8.) He also asserts that Ruby Johnson, who was not part of the arbitration panel, was nevertheless permitted to vote. *(Id.)* When asked at his deposition to identify the source for his assertions regarding McKnight and Johnson, however, Plaintiff refused to do so. (Otetiani El Dep. 51:8–52:2.) In opposition to summary judgment, Plaintiff effectively identifies his source: he has submitted the declaration of Ms. McKnight, who contends her vote was ignored and Ruby Johnson's was counted instead. (*See* Second McKnight Decl. ¶¶ 4–8, Ex. L to PSOF.) Plaintiff's failure to identify the source of this information in discovery arguably deprived Defendant of the opportunity to depose Ms. McKnight or otherwise rebut her claims; but the court notes that crediting McKnight's assertion would not support the conclusion that the result of the arbitration is suspect. It is undisputed that the other two panel members voted to uphold the disciplinary action, resulting in a 2-1 majority vote. (Favaro Decl. ¶ 5.) Nor does McKnight's declaration identify racial bias on the part of any of the panel members.

The final incident resulting in discipline occurred on November 1, 2013. Plaintiff left work at around 5:00 p.m. that day, leaving a patient waiting in the reception area for her scheduled x-ray. (Otetiani El Dep. 96:22–24, 98:1–12.) At 5:20 p.m., the nursing supervisor, Rose Marie Dodd, called Plaintiff and requested that he return; she explained that there was a patient waiting for an x-ray and reminded Plaintiff that he was the only x-ray technician working that day. (Id. at

98:1–12, 98:24–99:2.)  Plaintiff, nevertheless, refused to return.  He explained in his deposition that when he received Ms. Dodd's call, he was already halfway home and needed to meet his daughters there.  (*Id.* at 98:3–12.)  Plaintiff acknowledges that he did not check the lobby to see if there were any patients still waiting before he left for the day.  (*Id.* at 98:13–16.)  Advocate Policy requires that before leaving the facility at the end of his or her shift, the x-ray tech on duty must complete x-ray exams for every patient who has arrived for a scheduled appointment.  (Johnson Decl. ¶ 12.)

Advocate uses a computer program called Allscript Clinicare to track patient appointments and arrival times.  (Nix Decl. ¶ 5, Ex. K to DSOF.)  When a patient arrives, the registration desk staff enters the patient's name and time of arrival into the program, and the patient's name shows up on the x-ray tech's arrival screen.  (Otetiani El Dep. 102:12–24; Johnson Decl. ¶ 13.)  When Johnson confronted Plaintiff about his departure on November 1, Plaintiff asserted that he had checked his computer screen prior to leaving for the day and that the patient's name did not appear there, leading him to believe he was free to leave.  (Otetiani El Dep. 101:15–24, 102:1–6.)  Johnson checked the arrival screen for November 1, 2013 after the incident and found that the patient's name did appear on the screen.  (Johnson Decl. ¶ 14.)  Nix investigated the matter as well, but found no evidence of a computer malfunction that would have resulted in the patient's name not appearing on Plaintiff's arrival screen.  (Nix Decl. ¶ 5; Otetiani El Dep. 103:1–16.)  Plaintiff characterizes Nix's investigation of the incident as inadequate, but does not explain how it was inadequate or offer any evidence in support of his contention.  (Otetiani El Dep. 106:14–19.)  Instead, he maintains that a report of the IT department's incident tickets from the months surrounding his termination reveals numerous computer glitches, including several regarding "orders [ ] not crossing from RadNet to IDX." (Service Desk Tickets Report, Ex. F to PSOF.)  He also offered the declaration of Samuella McKnight stating that Advocate's computers could be slow and malfunction at times.  (First McKnight Decl., Ex. G to PSOF.)  According to Nix, however, problems with the RadNet or IDX programs are unrelated to the Allscript Clinicare program and

7

do not affect Advocate's systems for monitoring patient arrivals. (Nix Reply Decl. ¶ 12, Ex. A to Def.'s Resp. to PSOF.)

After Nix's investigation into the potential computer malfunction, and because Plaintiff had already received a Level 3 warning, Nix, Isaacs, and Johnson decided to terminate Plaintiff's employment for this further violation of Advocate Policy. (Nix. Decl. ¶ 6; November 18, 2013 Corrective Action Notice, Ex. L to DSOF; Otetiani El Dep. 95:4–13.) Plaintiff's termination occurred more than three years after he had changed his name and racial status in Defendant's HR records. (Otetiani El Dep. 97:1–23.) Again, pursuant to Advocate Policy, Plaintiff appealed the decision to terminate him; again, the panel voted to uphold the termination. (Id. at 114:7–13, 122:4–14.)

## IV.     Plaintiff's Claims of Racial Discrimination

On April 21, 2014, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights (IDHR) alleging that he was terminated because he is Native American. (Pl.'s IDHR Charge 2014CF2718 and Administrative Finding, Ex. N to DSOF.) The U.S. Equal Opportunity Commission issued a Notice of Right to Sue. (Pl.'s Compl.)

Plaintiff identifies the following as circumstantial evidence that his discharge was racially motivated: (i) Advocate allegedly made it difficult for him to receive exemptions from the mandatory flu vaccination and tuberculosis test starting in 2010; (ii) he heard allegedly offensive comments directed towards him in 2010 and 2011; (iii) his supervisor assigned him to assist with mammography records at a different site in 2011; (iv) Advocate temporarily reduced his hours between March 2011 and March 2012; and (v) Advocate's arbitration process was allegedly unfair. (Otetiani El Dep. 51:5–52:24, 108:20–109:24.) The court addresses these episodes below.

### 1.     Vaccinations and Tuberculosis Tests

Defendant requires all employees to receive annual flu vaccinations and tuberculosis tests because they work in a healthcare setting and have regular patient contact. (Gustafson Decl.

8

¶ 8.) Beginning in 2010, Plaintiff has declined the mandatory flu vaccination and tuberculosis test for religious reasons, opting instead to take a different test. (Otetiani El Dep. 15:3–7.) Plaintiff alleges that Defendant made it difficult to opt out of the vaccination and test by requiring him to resubmit paperwork to prove that the alternative test he preferred adequately fulfilled the required functions. (*Id.*) Defendant did ultimately allow Plaintiff to opt out of the flu vaccination and utilized the alternative tuberculosis test he requested (*see id.* at 16:8–10, 29:10–21), however, and Plaintiff acknowledges that Advocate makes it difficult for any person, not just Native Americans, to receive exemptions from the mandatory flu vaccinations and tuberculosis tests. (*Id.* at 29:4–9.)

### 2. Offensive Comments

Plaintiff alleges that after he changed his name in 2010, coworkers at Advocate joked that "it's not popular to be a Muslim right now." Plaintiff does not know who specifically made these comments, however, and admits that neither Johnson, Nix, nor Isaacs made such comments. (*Id.* at 16:13–17:24.) Plaintiff is not Muslim; he also admits the comments at issue were not based on his race. (*Id.* at 25:5–11.) Plaintiff does complain about a comment made by Karen Isaacs which he perceived as racial: specifically, at the end of a meeting Isaacs asked, "do you boys have any questions?" (*Id.* at 25:21–23, 54:2–7, 54:20–55:11, 56:10-13.) Plaintiff was offended by this comment, he testified, because most people would consider him to be African American and "boy" can be an offensive term to use with reference to an African American. Plaintiff admits, however, that Isaacs may not have meant the term in a derogatory way. (*Id.* at 55:4–16.)

### 3. Mammography Assignment

In early 2011, Defendant asked Plaintiff to assist with the handling of mammography records from a different facility. (*Id.* at 32:1-21.) Plaintiff testified that this assignment was "very taxing" and impossible to complete. He also testified that after two months of working on this task and complaining that it was impossible, the assignment "just went away." (*Id.* at 32:17–21, 35:18–

36:1.) Plaintiff was never disciplined for failing to complete this task, nor was he the only x-ray technician to receive this assignment. (*Id.* at 33:1–15, 34:10–17.)

### 4. Reduction in Work Hours

Advocate reduced Plaintiff's hours by 0.5 hours per day between March 2011 and March 2012 due to budget cuts. (*Id.* at 36:4–12; Gustafson Decl. ¶ 9.) During the same time period, Advocate also reduced the hours of at least seven other employees, none of them Native Americans. (Johnson Decl. ¶ 3.)

### 5. Arbitration Process

Plaintiff alleges that the declaration of Samuella McKnight demonstrates that the arbitration process was unfair because McKnight's vote was not counted. (Otetiani El Dep. 51:5–21; PSOF 8.) As noted earlier, however, regardless of whether McKnight's vote was counted, Plaintiff's discharge would have been upheld by a 2-1 vote.

## V. Plaintiff's Alleged Comparator

Plaintiff does not appear to know of any employee who reported to Ruby Johnson and who was not disciplined despite similar job performance. (Otetiani El Dep. 94:23–95:2.) Plaintiff alleges that Walter Johnson, a non-Native American, improperly performed an x-ray examination on a patient's abdomen—similar to how Plaintiff improperly combined two x-rays into one—but was not disciplined. (*Id.* at 93:9–94:24.) This assertion is incorrect, however, as the record shows that Walter was in fact issued a Level 1 Warning for his actions. (Walter Johnson Corrective Action Notice.) Nix explained that Walter was issued this level of warning because he had no prior discipline on file. Plaintiff, in contrast, had already been disciplined for his earlier failure to identify the correct patient for an x-ray, and received a more serious reprimand. (Nix Decl. ¶ 7; Johnson Decl. ¶ 8; May 22, 2013 Corrective Action.)

## ANALYSIS

I.      **Plaintiff's Challenge to the Propriety of Summary Judgment**

Before turning to the merits of Defendant's motion for summary judgment, the court pauses to address Plaintiff's argument that the motion is premature because he has been denied to opportunity to complete discovery. The court agrees that until the party opposing a motion for summary judgment has been allowed a full and fair opportunity to conduct discovery, the court should not rule on such a motion—but the court is satisfied that Plaintiff has had such an opportunity in this case.

This motion was filed on February 9, 2018. Plaintiff did raise discovery concerns during status hearings on both December 12, 2017, and January 9, 2018, but those concerns were not related to the documents which he now claims have been withheld from him. (12/12/17 Tr. of Proceedings [35] 7:13–14, 8:3–7; 1/9/18 Tr. of Proceedings [36] 3:5–11.) Specifically, Plaintiff asked for the names of all persons on any of his arbitration panels, and the records of any disciplinary actions which involved Camille Nix. (*Id.*) Plaintiff told the court he had no other discovery concerns, and the court ordered Defendant to provide Plaintiff the information it had regarding the panel members and other disciplinary actions involving Nix. (12/12/17 Tr. of Proceedings 10:7–9.) After the January 9, 2018 status hearing, Plaintiff never contacted Defendant or attempted to confer with Defendant about its responses. (Def.'s Reply in Supp. of its Mot. for Summ. J. [37] ("Def.'s Reply Br."), 14.) Further, Plaintiff never raised any additional discovery concerns with this court, nor did he object when the court set a briefing schedule for summary judgment. In addition, Plaintiff did not file any motion to compel discovery during the two-month period after this court set the summary judgment briefing schedule.

Now, in his Response to Defendant's Motion for Summary Judgment, Plaintiff contends that he is still missing a 2013 financial statement from Defendant as well as an additional IT department report. (Decl. in Supp. of Pl.'s Opp'n to Def.'s SJ Mot. [32] ("Pl.'s Resp. Aff."), 2.)

Plaintiff did not raise these concerns at any point prior to filing his response, however, and has not yet explained how these remaining documents are material to his case.

Case law and the Federal Rules of Civil Procedure support Defendant's contention that summary judgment is proper despite Plaintiff's argument that discovery has not been completed. The Seventh Circuit has held that even *pro se* litigants must comply with procedural rules such as Rule 37(a)(1). *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 (7th Cir. 2000); *Pearle Vision Inc., v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008.) The Seventh Circuit has also recognized that a district court is entitled to deny a motion to compel discovery after the filing of a motion for summary judgment where the material requested is immaterial to the case. *Packman v. Chi. Tribune Co.*, 267 F.3d, 628, 647 (7th Cir. 2001). Plaintiff here did not raise his discovery concerns in a timely fashion, never filed a motion to compel or conferred with the Defendant regarding the desired documents, and has not yet explained how the requested documents are material to his case. The court concludes it is appropriate to address Defendant's motion for summary judgment despite Plaintiff's objection.

## II. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v Catrett*, 477 U.S. 317, 325 (1986).

**III.     Analysis of Employment Discrimination Claims**

In addressing a motion for summary judgment in a case of employment discrimination, the court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  The evidence should be evaluated as a whole, regardless of whether it can be characterized as "direct" or "indirect."  *Id.* at 766.  "[T]he appropriate question on summary judgment is simply: could a reasonable jury find based on all available evidence that a discriminatory or retaliatory motive caused [plaintiff"s] termination?"  *Grant v. Tr. of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017) (citing *Williams v. Office of the Chief Judge of Cook Cty.*, 839 F.3d 617, 626 (7th Cir. 2016)).

Under the standard formulation, a plaintiff can establish an inference of racial discrimination by showing that "(1) [he] is a member of a protected class, (2) [he] performed reasonably on the job in accord with [his] employer's legitimate expectations, (3) despite [his] reasonable performance, [he] was subjected to an adverse employment action, and (4) similarly situated employees outside of [his] protected class were treated more favorably by the employer." *David v. Bd. of Tr. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).  When a plaintiff offers such evidence, the employer may defeat the inference by articulating a legitimate reason for the adverse employment action; the plaintiff is then free to demonstrate that the articulated reason is in fact pretextual.  *Id.*  An employer's explanation for firing an employee is pretextual if the "employer's explanation is unworthy of credence"—that is, where the reason offered is a "lie rather than an oddity or an error."  *Hague v. Thompson Distribution Co.,* 436 F.3d 816, 823 (7th Cir. 2006) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir. 2000)); *Filar v. Bd. of Educ. Of City of Chi.*, 526 F.3d 1054, 1063 (7th Cir. 2008) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000).  Notably, when an "employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the pretext inquiry." *Collins v. Am. Red Cross*, 715

13

F.3d 994, 1000 (7th Cir. 2013) (affirming summary judgment for employer that discharged employee for misconduct.)

## IV.     Analysis of Otetiani El's Case

Although the Plaintiff is a member of a protected class, Native Americans, he offers virtually no evidence to satisfy the other three elements necessary to prove his case. Plaintiff's argument that he performed his job duties satisfactorily is defeated by his own admission to all three instances of misconduct which the Defendant cites as the reason for his termination. Advocate issued three escalating warnings to Otetiani El over a six-month span for x-raying the wrong patient, violating doctor's orders and breaking procedure by combining multiple x-rays into one image, and leaving a waiting patient behind when he clocked out for the day. Otetiani El admitted that all of these actions violated Advocate procedure and expressed remorse for his first two errors. (*See* Otetiani El Dep. 45:14–16, 46:22–47:3, 90:20–91:21.) As for the final incident, Plaintiff insists that he would not have abandoned a waiting patient but for a computer glitch; however, there is no evidence that the relevant software was malfunctioning that day. (*See* Nix Decl. ¶ 5; Johnson Decl. ¶ 14.) A computer glitch would not excuse his failure to check the lobby area in person, nor his subsequent refusal to return to work when the nursing supervisor called to tell him about the patient he left behind. The undisputed evidence defeats any suggestion that Plaintiff was performing his job satisfactorily when Defendant decided to terminate him.

Further, Plaintiff has made no effort to establish that Defendant's performance-based explanation for his termination was merely pretext covering up for racial discrimination. Plaintiff clearly disagrees with Defendant's reasons, but that is not enough to demonstrate that those reasons were pretextual. *See, e.g., Hague,* 436 F.3d at 825 (affirming summary judgment for the employer and rejecting plaintiffs' arguments that "merely call[ed] into question [the employer's] judgment"). Even if Advocate was wrong to fire Otetiani El based on these instances of misconduct, the Seventh Circuit has repeatedly explained that the question "is not whether [Advocate's] stated reason was inaccurate or unfair, but whether [Advocate] honestly believed

14

the reason it has offered" for the discipline. *Liu v. Cook County*, 817 F.3d 307, 316 (7th Cir. 2016) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). Courts "do not sit as [ ] super-personnel department[s], examining the wisdom of employer's business decisions." *Id.* at 318. Otetiani El has offered no evidence that Advocate's managers did not truly believe he had committed the violations that supported his termination.

There is no evidence that Defendant treated similarly situated employees of other races more favorably. The only comparable employee Plaintiff identified for this purpose is Walter Johnson, who incorrectly performed an abdominal x-ray on a patient. (Otetiani El Dep. 93:9–94:22.) Both Plaintiff and Walter Johnson held the position of x-ray tech, but Johnson had a different supervisor, and the two men had different disciplinary histories. Johnson had never been disciplined prior to his error. (*See* Walter Johnson Corrective Action Notice; Nix Decl. ¶ 7.) Plaintiff had received a warning for x-raying the wrong patient just one month before he intentionally disobeyed a doctor's x-ray order and received a harsher, Lever 3 Warning. (June 27, 2013 Corrective Action.) The difference between the two men's disciplinary histories explains the difference in discipline given for relatively similar mistakes.

### V. Lack of Evidence of Discrimination

This court previously dismissed Plaintiff's harassment claims as untimely, but noted that Plaintiff was still free to introduce evidence of harassment to establish that his termination was racially motivated. (7/31/17 Minute Order [21].) The incidents he cites, however, are insufficient for that purpose. First, Plaintiff claims that he experienced resistance when seeking exemptions from the mandatory employee flu vaccination and tuberculosis test in 2010 and 2011. (Otetiani El Dep. 15:3–7, 26:21–23, 28:8–13.) But Plaintiff acknowledged that he sought those exemptions based on his religion, not race, and that it was difficult for *all* employees to receive exemptions because the flu vaccination and tuberculosis test are strict requirements for Advocate's employees. (*Id.* at 15:3–7, 16:8–10, 29:4–21.) In the end, Plaintiff received his requested exemptions each time. (*Id.*)

Second, Plaintiff contends he was assigned the "impossible" task of handling mammography records from a different facility. (*Id.* at 32:23–33:16, 36:2–3.) Although Plaintiff believes this assignment was unfair, he testified that he was never disciplined for failing to complete the assignment and that it was removed from his workload after he complained about it. (*Id.* at 32:17–21, 33:13–14, 35:18–36:1.) There is no evidence to suggest that Plaintiff received this assignment because of his race; indeed, Plaintiff testified that another, non-Native American employee was also assigned to the project and was disciplined for failure to complete it. (Otetiani El Dep. 34:2-24, Ex. B to DSOF.) The fact that an employee of a different race was disciplined for not completing the same assignment that Plaintiff did not complete would suggest that Plaintiff was treated *more* favorably than the other worker. Plaintiff also notes the temporary reduction in his hours in 2011, but the undisputed evidence shows that the reduction was a function of budget cuts—cuts which affected several non-Native American employees' work hours as well. (Gustafson Decl. ¶ 9; Johnson Decl. ¶ 3.) In any event, none of Plaintiff's examples suggest that Defendant was motivated by race when it terminated him more than two years later.

Finally, Plaintiff complains about comments made by several Advocate employees in 2010 or 2011. Referencing his then-recent name change, unidentified employees commented that "it's not popular to become Muslim at this point." (Otetiani El Dep. 16:13–19.) Defendant acknowledges that such comments are "certainly inappropriate" and potentially offensive. (Def.'s Opening Br. 12.) Those comments do not reflect bias against Native Americans, however, as Plaintiff admits. (*Id.* at 25:5–11.) Plaintiff admits, further, that none of the supervisors involved in his discharge ever made such a joke or comment, nor was any supervisor aware that it happened. (*Id.* at 17:14–24, 56:23–57:5.) In addition, Plaintiff states that Karen Isaacs once concluded a meeting by asking Plaintiff and another worker "Do you boys have any questions?" (*Id.* at 54:20–55:11.) Referring to an African-American man as a "boy" can be offensive, but Plaintiff admitted that Isaacs "may not have meant it that way," and did not know the race of the other worker to whom the comment was made. (*Id.* at 55:4–16.) And, as with Plaintiff's previous example, this

16

comment does not relate to Plaintiff's claimed protected class (Native-American) and was made two years prior to his discharge. Even if Isaac's single comment were construed as evidence of racial bias against a Native American, the distance in time between the comment and the adverse employer action would defeat the notion that the discharge was racially motivated. *Cf. Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (comment made months prior to the plaintiff's discharge is too distant in time to allow for an inference of discrimination).

## **CONCLUSION**

Defendant's motion for summary judgment [28] is granted.

ENTER:

[signature]

Dated: August 1, 2018

REBECCA R. PALLMEYER
United States District Judge